IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JEANNE S.,<br>     Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>     Defendant. | Case No. 1:17-cv-1502-JEH |

## Order

Now before the Court is the Plaintiff Jeanne S.'s Motion for Summary Judgment (Doc. 14) and the Commissioner's Motion for Summary Affirmance (Doc. 17).[1] For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Commissioner's Motion for Summary Affirmance.[2]

**I**

Jeanne S. filed her applications for disability insurance benefits (DIB) and supplemental security income (SSI) on May 30, 2014. She alleged disability beginning on January 1, 2014. Her claims were denied on December 18, 2014 and were denied upon reconsideration on February 25, 2015. Jeanne filed a request for hearing concerning her applications for DIB and SSI on March 19, 2015. A hearing was held before the Honorable Shreese M. Wilson (ALJ) on September 1, 2016. At that hearing, Jeanne was represented by an attorney and a Vocational Expert (VE)

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 12, 13).
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 7) on the docket.

1

testified. Following the hearing, Jeanne's claims were denied on October 26, 2016. Her request for review by the Appeals Council was denied on October 13, 2017, making the ALJ's Decision the final decision of the Commissioner. Jeanne timely filed the instant civil action seeking review of the ALJ's Decision on November 13, 2017.

## II

At the hearing on September 1, 2016, Jeanne was 49 years old, 5'5", and 103 pounds. She was divorced and lived with her 17-year-old daughter, her 11-year old son, and her ex-husband. Her father-in-law drove her to the hearing, and she testified she had no trouble making the ride over from Galesburg, Illinois. Jeanne also testified that she received her GED and then obtained a degree in computer science in college. She previously worked as an assistance manager at Family Dollar, in customer service at a grocery store, and as a cashier and supervisor at Kroger. She quit her job at Family Dollar because she had taken too many days off to care for her prematurely born granddaughter, and she was given the choice to quit or be fired. Jeanne explained that she tried to get a job at Family Dollar again, but she was told that because she "couldn't lift," could not stand or sit very long, and was on narcotics, there was no job for her. AR 59. She testified those three things prevented her from obtaining jobs elsewhere as well.

Jeanne's attorney then questioned her. She stated that her medication side effects included sleepiness and "kind of a little bit of confusion and –[.]" AR 61. She testified that the number one reason she could not work was because she could not lift things, her hands "are going numb, I drop things." *Id*. She explained further that the numbness never stopped and nothing made it worse. Jeanne said she used a plastic cup to drink her coffee so it would not break if she dropped the cup. She testified to an inability to lift a whole coffee pot full of coffee. She dropped things "[e]very day" and did not do the dishes at her house because she

dropped plates. AR 62. She said her hands swelled and she had arthritis in them. Jeanne also said that things had changed since August 2014 (her Function Report – Adult) which indicated she cleaned the house and did the dishes); things had become "worse" since then. *Id*. As of the hearing date, Jeanne's daughter did the dishes and the laundry. When asked if she could hold a brush to brush her own hair, Jeanne answered, "Not really. My daughter does it." AR 65. She used a "bigger than normal razor" so that she could grip it. *Id*. She wore sweat pant-type material because she could not zip or button jeans. Jeanne testified that she could not twist the lid off of a brand-new gallon of milk and did not usually pour milk because it went "all over the place if I try." AR 66. Part of the reason why she did not drive though she had a driver's license was because she did not feel safe driving a vehicle if she could not feel her hands. She added, "And plus I get really nervous behind the wheel." AR 67.

Jeanne stated that she treated with Jacob C. Tony, M.D. for her arthritis at Methodist Neurology. She said both of her arms were "[t]he same" in terms of numbness or tingling or pain. AR 66. She then testified that her back pain went from the neck all the way to the middle of her back. She was "always in pain." AR 68. Jeanne testified to balance problems as well. Her neck pain traveled into both shoulders. She was in "extreme pain" at the hearing. AR 69. When her attorney noted that people with pain at a level of 10 out of 10 would go to the emergency room, she explained the pain was not so bad that she thought she should go to the emergency room. "I'll take some pain medication when I get in the truck or van." AR 69. She then asked whether the ALJ minded if she stood up for a minute. Injections and physical therapy did not help reduce her back pain. She was told by a surgeon that there was nothing that could be done for her back pain in terms of surgery. The medications she was on made her pain "tolerable," it was "just dull" on those medications. AR 70. She did not think her tolerable

3

pain allowed her to play with her granddaughter, but it was tolerable enough to walk, "but not very far." AR 71. She found that reclining back in a recliner was a "comfortable" position. *Id*. She then stated, "Nothing's comfortable." *Id*. She believed she could stay in her recliner for about 10 minutes before she had to get up to stand and move around.

When prompted by her attorney as to the evidence of headaches in the record, Jeanne stated that she had headaches every day. The doctors did not give her any medicine for those headaches because she was already on narcotics. Jeanne further testified that her migraine headaches made her sensitive to light and noise and caused her to see floaters. She would have to lay in bed in a dark, quiet room when she had a migraine. She explained she visited the emergency room if her migraines become bad enough. When her attorney mentioned he did not see any recent emergency room visits in the record, Jeanne stated that she tried to "hold off until they [got] really bad because [she] didn't like shots." AR 73. She also stated she had visions issues "all the time" and then commented that her grandson broke her glasses which were currently still broken. AR 74.

Later at the hearing, Jeanne's attorney asked her if she would be able to perform her past job that involved dealing with the public. Jeanne answered she did not believe so because her bipolar disorder had "gotten worse" and she would "probably get fired" because she would become rude or say inappropriate things to the public. AR 80. The ALJ asked Jeanne some follow up questions. She testified that a doctor placed a five-pound lifting restriction on her because of her back pain and "some due to [her] hands." AR 86. Jeanne also testified she believed she could walk a half a block before she would have to stop and sit down. She believed she could be on her feet five minutes before she would have to sit down. She believed she could sit for about 10 minutes before she would have to stand up and change positions. Jeanne stated she was unable to lift her grandchildren. Her

4

pain varied in duration; "[s]ome days good, some days bad. Depends on the weather." AR 92.

The ALJ proceeded to question the VE. The ALJ presented the VE with the following hypothetical:

> Initially I would like for you to assume that we have an individual that's the same age that the Claimant is, this individual was 46 as of the alleged onset date, is currently 49, this individual has the same at least high school education that the Claimant has and the same work history that the Claimant has. Initially I'd like for you to assume this individual would be limited to lifting or carrying 20 pounds occasionally and 10 pounds frequently, this individual would be able to stand or walk up to six hours in an eight hour work day, this individual will be able to sit up to six hours in an eight hour work day, this individual should never climb ladders, ropes or scaffolds, no more than occasionally climb ramps or stairs, no more than occasionally stoop, kneel, crouch or crawl, this individual would be precluded from constantly handling and fingering with the right upper extremity, that would be the dominant upper extremity, that the individual would be able to frequently handle and finger . . . They would be precluded from constantly handling and fingering with the dominant right upper extremity but they could frequently handle and finger with the dominant right upper extremity. There would be no limitations with the left upper extremity. This individual would be limited to tasks that can be learned within 30 days that are routine and repetitive in nature, and an individual should be in an environment with no more than occasional interaction with the general public, co-workers or supervisors. Given those limitations would such an individual be able to return to any of the Claimant's past jobs?

AR 94-95. The VE responded in the negative, but testified such an individual could perform the jobs of marker I, cafeteria attendant, and router at the light level and addresser, cutter and paster, and stuffer at the sedentary level. The ALJ then questioned the VE whether the individual's ability to perform the identified jobs would be affected if the hypothetical were changed to limit fingering and handling

5

to bilateral instead of only the right upper extremity. The VE answered those jobs would not be affected. The ALJ changed the hypothetical several more times to include additional limitations. One of which limited the hypothetical individual to no more than two hours of standing and walking in an eight-hour work day and to lifting no more than five pounds. The VE responded that the sedentary jobs of addresser and cutter and paster would remain viable.

Jeanne's attorney then asked the VE if the identified jobs following the first hypothetical (set forth above) would be affected if the individual were limited to only occasional handling and fingering in the dominant hand. The identified jobs would be eliminated, but the jobs of fruit distributor and groover and striper operator would be available at the light level. If that occasional handling and fingering limitation applied bilaterally, those jobs would remain.

### III

In her Decision, at Step Two, the ALJ determined Jeanne had the following severe impairments: degenerative disc disease of the lumbar spine; osteoarthritis; mono-neuropathy of the right upper extremity; bipolar disorder; generalized anxiety disorder; and depression. AR 15. The ALJ noted that Jeanne alleged disability due to bipolar affective disorder, migraines, vision problems, and arthritis. The ALJ explained that the impairments she listed as severe had "more than a minimal effect on [Jeanne's] ability to perform basic work activities" and thus the ALJ found them to be severe impairments. AR 16. In support of her findings, the ALJ cited to Jeanne's October 2014 comprehensive internal medicine consultative examination and her October 2014 comprehensive psychological consultative examination. During the former, Jeanne said she underwent several treatment modalities for degenerative disc disease including chiropractic treatments, physical therapy, and trigger point injections all of which had not been beneficial. Her neck and back pain were constant and sharp at a 7/10-10/10 in

6

pain intensity. Associated symptoms included stiffness. She said her pain was aggravated with heavy lifting, twisting, and bending. She started to have pain in her hands four years before, but she denied any swelling. At Step Four, the ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift and carry 20-pounds occasionally and 10-pounds frequently, stand and walk 6 hours out of an 8-hour workday, and sit for 6 hours out of an 8-hour workday. She can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crawl and climb ramps and stairs. She could perform handling and fingering no more than frequently with the right upper extremity. She is limited to tasks learned within 30 days that a [sic] routine and repetitive in nature with no more than occasional contact with the public, coworkers, or supervisors.

AR 18.

In making that finding, the ALJ set forth Jeanne's statements about her limitations, including that she reported she stopped working on June 30, 2010 because of her medical conditions.

The ALJ detailed a medical record dated January 16, 2014 from Jeanne's visit to Vaughn E. Hanna, M.D. At that appointment, Jeanne reported persistent pain in her neck and back, occasional bilateral hand numbness, and muscle tension headaches. She reported she took Norco as needed for pain, Gabapentin, Clonazepam, and Trileptal without side effects. A musculoskeletal examination was negative for synovitis in the upper or lower extremities, and a physical examination of her extremities revealed osteoarthritic changes of the fingers and pain with active range of motion of the thoracic spine. There was no swelling or synovitis of the peripheral joints. A tender point examination demonstrated tenderness in the trapezius and thoracic paraspinal muscles. A neurological examination was negative for focal deficits or weakness. Dr. Hanna diagnosed

7

chronic pain, back pain, neck pain, and multiple site osteoarthritis. He instructed Jeanne to continue her present medications and home exercise regimen. Dr. Hanna's January 2014 note included "thin lady with mild pain behaviors; gait normal." AR 448. Notably, that same note is included in Dr. Hanna's later treatment notes to which Jeanne points dated January 2016. AR 655 ("Thin lady with mild pain behaviors. Ambulates without assist device").

The ALJ also detailed Jeanne's October 29, 2014 comprehensive internal medicine consultative examination results. At that time, Jeanne's range of motion of her shoulders, elbows, wrists, hips, knees, and ankles was not limited. The ALJ noted consultative examining William J. Lopez, M.D. diagnosed Jeanne with cervicalgia without radiculopathy, lumbago without radiculopathy, cervical and lumbar degenerative disc disease, and degenerative joint disease of the hands, stable bipolar affective disorder, migraine headaches, and tobacco use. AR 20. In November 2014, Jeanne reported she had been doing "quite well" and did not have any major complaints at that time. AR 21. In June 2015, she reported she had been doing "fairly well" except that she still had severe back problems and pain due to arthritis. *Id*. In November 2015 she reported she was doing "very well" on her current medication regimen. *Id*. In January 2016 she reported she was doing "very well" on her current medication regimen and she did not have any major complaints. AR 22. In April 2016, Jeanne reported she was doing "very well" on her current medication regimen except that she still had chronic back pain. *Id*.

The ALJ concluded Jeanne's impairments could reasonably be expected to produce some of the symptoms she alleged, but support for her allegations as to the frequency, intensity, and persistence of those symptoms was lacking in the record. The ALJ pointed to her musculoskeletal examination, physical examination, tender point examination, and neurological examination in January 2014, range of motion testing in October 2014, and diagnostic testing throughout

the record. With regard to the opinions of record, the ALJ accepted the State Agency medical consultant's opinions but found Jeanne's ex-husband's opinions not dispositive "as, like the contentions of the claimant, the objective medical record and the claimant's actual functioning do not support them." AR 23.

## IV

Jeanne argues: 1) the ALJ erred in finding Jeanne's migraine headaches were not a severe impairment; 2) the ALJ violated SSR 16-3p and failed to build an accurate and logical bridge from the evidence to her ultimate conclusion regarding Jeanne's osteoarthritis and related pain; and 3) the ALJ failed to properly consider the limitations cause by Jeanne's arthritis and neuropathy in her hands.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for

9

disability. *See* 20 C.F.R. §§ 404.1566; 416.966.³ The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any

---

³ The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Jeanne claims error on the ALJ's part at Steps Two, Four, and Five.

### A

Jeanne argues that the ALJ erred at Step Two by not finding her headaches were a severe impairment. She argues the record contained consistent treatment and testimony confirming Jeanne's continued, frequent migraines. The Commissioner argues that none of the records to which Jeanne cites demonstrate that her migraine headaches imposed more than a minimal burden on her ability to function. The Commissioner also contends that the discrepancy between Jeanne's allegations about the severity of her headaches and the record suggest symptom exaggeration that the ALJ was not required to credit.

Jeanne's argument does not support remand. "Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019). Here, the ALJ determined Jeanne had six severe impairments and proceeded to Steps Three, Four, and Five. Thus, the ALJ's failure to identify Jeanne's alleged migraine headaches as a severe impairment was harmless. While an ALJ must later consider the limitations caused by all of a claimant's impairments, both severe and non-severe, *Ray*, 915 F.3d at 493, Jeanne only summarily argues, "Obviously, this type of symptomology [daily headaches, blurred vision, vision

11

loss, and seeing floaters] would affect the claimant's work in terms of affecting concentration, staying on task, and could cause her to take additional unscheduled breaks." Plf's MSJ (Doc. 15-1 at pg. 8). Jeanne did not raise any arguments as to the ALJ's RFC finding as it pertained to Jeanne's concentration, persistence, or pace. The Court will not make Jeanne's arguments for her. Moreover, as discussed *infra*, the ALJ did not violate SSR 16-3p in her consideration of Jeanne's subjective complaints of disabling limitations; it is therefore clear why the ALJ did not explicitly assess limitations allegedly caused by Jeanne's migraines. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").

**B**

Jeanne also argues that the ALJ engaged in "cherry-picking" that the courts have discouraged to come to her conclusion that Jeanne could perform light work. She argues the totality of the evidence shows her pain and other symptomology would cause her to be unable to perform even sedentary work. The Commissioner disputes the record evidence established Jeanne was unable to sustain any full-time work activities. The Commissioner argues, instead, the ALJ properly considered examination results, diagnostic testing, and Jeanne's subjective allegations.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016), *citing* SSR 16-3p, 81 Fed. Reg. 14166 (Mar. 16, 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) are to be considered including: the claimant's daily activities; the location, duration,

12

frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8. SSR 16-3p reminds those considering it that, "Subjective symptom evaluation is not an examination of an individual's character." *Id*. at *2.

In her Decision, the ALJ noted Jeanne's then-current prescription medications, considered Jeanne's objective medical evidence dated between January 2014 and Setpember 2016, and considered the opinion evidence of record. Jeanne's medical records revealed that she continued to complain of pain in her neck and back and pain in her hands throughout the relevant period. The ALJ also indicated, however, the times when Jeanne reported she was doing "quite well" or "very well" without any major complaints and when she was doing "fairly well" except for complained of severe back problems and pain. AR 21-22. During Jeanne's comprehensive internal medicine consultative examination, Dr. Lopez noted Jeanne had no difficulty using her hands and fingers, she exhibited 5/5 grip strength bilaterally, she had 5/5 motor strength in the upper and lower extremities, her cervical and lumbar spine range of motion was not limited, and supine and seated straight leg raise tests were negative bilaterally. Psychological consulting examiner Mark Browning, RN, Psy.D. noted Jeanne ambulated in the office without consequence and appeared anxious and physically uncomfortable (shifting in her chair frequently throughout the assessment).

As for particular test results, Jeanne's left forearm x-ray in December 2014 (upon her complaints of pain) revealed normal appearing bony structures with no fracture or dislocation, and her August 2015 nerve conduction study and electromyograph (upon her complaints of tingling and numbness in the fingertips

for the past three months with occasional neck pain) showed evidence of right ulnar and right median neuropathy without denervation changes, but no denervation in the cervical spine. Jeanne's August 2016 x-ray (upon her complaints of low back pain without sciatica, unspecified back pain laterally, and unspecified chronicity) was negative for evidence of traumatic injury, lytic abnormality, or acute changes. A September 2016 MRI of Jeanne's thoracic spine (upon complaints of chronic back pain and history of monoclonal gammopathy) was negative for any acute changes. After the ALJ detailed Jeanne's medical records as they pertained to her physical impairments, the ALJ explained:

> While diagnostic testing did reveal some significant findings [as noted earlier in the Decision], these findings must correlate with clinical examination. In the present case, despite subjective complaints of disabling neck, back, and bilateral hand pain that impedes her performance in most activities including working, the claimant's clinical presentation is largely within normal limits or only mild deficits are noted.

AR 23.

Earlier in her Decision, the ALJ listed Jeanne's daily activities to include caring for her children, caring for her pets, preparing simple meals daily, performing light housekeeping, managing her own personal finances, and attending to her own personal hygiene. The ALJ later noted that Jeanne said migraine headaches and diffuse musculoskeletal pain interfered with her ability to perform most activities of daily living. AR 19. The ALJ acknowledged that in October 2014, Jeanne indicated to internal medicine consulting examiner Dr. Lopez that she underwent "several treatment modalities for degenerative disc disease including chiropractic treatments, physical therapy, and trigger point injections." AR 20. She said those treatments were not beneficial. She was

continued on her medication regimen throughout the majority of the relevant time period.

It is apparent that the ALJ correctly considered Jeanne's subjective symptoms and did not evaluate her character. The ALJ did *not* disregard Jeanne's subjective complaints about her pain and its effect on her ability to work solely because those complaints were not substantiated by objective medical evidence. *See Israel v. Colvin*, 840 F.3d 432, 440 (7th Cir. 2016) (citing cases providing the "repeatedly stated" fact that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence"). In addition to the objective evidence considered, the ALJ also included in her Decision Jeanne's daily activities, the medications and non-medication treatments she had received, and the frequency with which she complained of pain. Furthermore, SSR 16-3p expressly permits an ALJ to consider the objective medical evidence as it is "a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities for an adult[.]" SSR 16-3p at *5.

Jeanne lists various medical records and portions of her testimony to illustrate the error the ALJ allegedly committed in considering her osteoarthritis and related pain. Given the manner in which she did so, Jeanne invites the Court to reweigh the evidence, but it will not do so. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (stating the court does note substitute its judgment for that of the ALJ). Also, the records she lists include information strikingly similar to that which the ALJ cited in her Decision. The fact that the ALJ did not discuss those records does not amount to "cherry-picking;" the ALJ did not ignore an entire line of evidence contrary to her ruling. *See id*. (explaining an ALJ may not ignore an

entire line of evidence that is contrary to the ruling); *see also Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding"). Of course, an ALJ need not discuss every piece of evidence. *Terry*, 580 F.3d at 477.

## C

Jeanne similarly lists record evidence pertaining to arthritis and neuropathy in her hands in support of her third argument that the ALJ – without substantial support for her finding – determined Jeanne could perform handling and fingering at a frequent level with her right upper extremity and no limitations in her left arm and could perform light work lifting up to 20 pounds. She contends that the ALJ's hypothetical to the VE was therefore incomplete as it failed to apprise the VE of all of Jeanne's limitations supported by the evidence.

Even if reasonable minds could differ concerning whether Jeanne's hand impairments limited her further than set forth in the RFC finding, the Court must affirm the ALJ's decision if the decision is adequately supported. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The ALJ's Decision in this case is adequately supported. The Court has already determined that the ALJ's evaluation of Jeanne's subjective complaints was not erroneous. That proper evaluation coupled with the ALJ's recitation of evidence pertaining to Jeanne's hands provide the substantial evidence necessary to affirm the ALJ's Decision. The ALJ confronted the evidence that Jeanne sought treatment for numbness in her hands on separate occasions and that an EMG study showed evidence of right ulnar and median neuropathy without any denervation changes. The ALJ also highlighted evidence which provided that Jeanne had no swelling or inflammation in her joints, had full grip strength in both hands and no difficulty using her hands, and had full motor strength in her upper extremities. The ALJ accepted as

"reasonably consistent" with the longitudinal treatment record the State Agency physicians' opinions. Those opinions provided Jeanne was capable of light work with no manipulative limitations. The ALJ built a logical bridge between the evidence and her RFC finding of limitation to no more than frequent handling and fingering with the right upper extremity. Put simply, the ALJ clearly limited Jeanne's right upper extremity as she did because there was evidence that supported some right-handed limitation. The ALJ accordingly committed no error in the posing the hypotheticals that she did at the hearing. See

Finally, Jeanne's arguments that the ALJ relied upon outdated opinions to deny her claims and gave little weight to numerous treating doctors are unpersuasive. No treating doctors opined as to Jeanne's functional limitations. Jeanne merely points to their treatment records which set forth her subjective complaints and their objective findings, assessments, and plans. As for the "outdated" State Agency opinions, Jeanne argues there was "a year and a half of treatment with specialists for her arthritis which shows consistent issues [that] reasonably could have changed the non-examining physicians' opinions." Plf's MSJ (Doc. 15-1 at pg. 4). Those "consistent issues" – for example, complained of osteoarthritis – were raised by Jeanne earlier and were before the State Agency doctors at the time they reviewed her records. The Court also notes that Jeanne's two cited cases in support of her argument about "outdated" opinions are not persuasive given the particular facts of those cases. In *Stage v. Colvin*, a doctor's report diagnosed the claimant with a hip deformity, a restricted range of motion, and the need for a total left hip replacement which the Seventh Circuit Court of Appeals said "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the doctor's] report." 812 F.3d 1121, 1125 (7th Cir. 2016). In *Goins v. Colvin*, rather than submit a MRI (the first of the claimant in 11

years) to medical scrutiny, the ALJ played doctor and summarized the MRI results "in barely intelligible medical mumbo jumbo, noting that it revealed degenerative disc disease and stenosis while ignoring the Chiari I malformation." 764 F.3d 677, 680 (7th Cir. 2014). The ALJ in that case overlooked the fact, in disbelieving that the claimant had migraine headaches, that a Chiari I malformation could cause severe headaches. *Id*. at 680.

Unlike in *Stage* and *Goins*, Jeanne does not identify particular evidence that "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment" by the State Agency doctors in this case. *See Stage*, 812 F.3d at 1125. Nor did the ALJ play doctor in this case because it was unnecessary to do so. As discussed above, the later-dated evidence was strikingly similar to the evidence before the State Agency doctors. The ALJ acknowledged as much when she determined the State Agency doctors' opinions were "reasonably consistent" with Jeanne's longitudinal treatment record. AR 23.

Reversal of the ALJ's Decision in this case is unwarranted.

## V

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 14) is DENIED and the Defendant's Motion for Summary Affirmance (Doc. 17) is GRANTED. The Clerk of Court is directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, denying benefits to the Plaintiff, Jeanne S., is AFFIRMED."

This matter is now terminated.

*It is so ordered.*

Entered on March 8, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE